```
1                 UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2      ---------------------------X

3      UNITED STATES OF AMERICA

4                    v.              Criminal Case 21-366 (JEB)

5      GARY EDWARDS,

6                 Defendant

7      ---------------------------X
                                Washington, D.C
8                               Monday, December 20, 2021
                                11:00 a.m.
9
                        TRANSCRIPT OF THE SENTENCING
10           BEFORE THE HONORABLE JAMES E. BOASBERG
                     UNITED STATES DISTRICT JUDGE
11     APPEARANCES:

12     For the Government: Christopher Amore, AUSA
                            DOJ-USAO
13                          District of New Jersey
                            970 Broad Street, Suite 700
14                          Newark, NJ 07102
                            (973)645-2757
15
       For the Defendant:  Adam D. Harris, Esq.
16                          LAW OFFICE OF ADAM D. HARRIS L.L.C.
                            600 Jefferson Plaza, Suite 201
17                          Rockville, MD 20852
                            (301) 960-5005
18

19

20

21

22     Court Reporter:     Lisa Walker Griffith, RPR
                            U.S. District Courthouse, Room 6507
23                          Washington, D.C.  20001
                            (202) 354-3247
24

25
```

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Good morning, everyone. We're

3     here for a sentencing in criminal case 21-366, United States

4     of America versus Gary Edwards.

5          Starting with counsel for the government, if you

6     would approach the lectern and identify yourself for the

7     record.

8          MR. AMORE:  Good morning, Your Honor.  Christopher

9     Amore, Assistant U.S. Attorney for the United States.

10          THE COURT:  Good morning.

11          MR. HARRIS:  Good morning, Your Honor.  Adam Harris

12     on behalf of the Gary Edwards.

13          THE COURT:  Thank you.

14          Mr. Edwards, good morning to you also.

15          THE COURTROOM DEPUTY:  Your Honor, probation is via

16     zoom video.

17          THE PROBATION OFFICER:  Carmen Newton from

18     probation.

19          THE COURT:  Thank you.

20          All right.  Given the latest spread of the Omicron

21     variant, we'll have everybody keep their masks on for the

22     proceeding today.

23          I have reviewed the materials that have submitted.

24     Anything preliminary for the government?

25          MR. AMORE:  Nothing for the government, Your Honor.

1          THE COURT:  Defense?

2          MR. HARRIS:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Amore, I will hear from you.

4          MR. AMORE:  Thank you, Your Honor.  Good morning.

5      I think to start, it's only fair to acknowledge that

6  the defendant in this case did not commit any acts of

7  violence, did not destroy any property, did not commit any

8  theft.  But as Your Honor is aware, if he had, he would be

9  sitting here, facing felony charges and he is not, he is

10 facing a misdemeanor charge.

11     Just because the defendant did not commit any act of

12 violence, destroy any property, it doesn't mean he had no

13 role in the attack on the Capitol on January 6.  Without

14 rioters, there is no riot.  And as Your Honor is aware, the

15 mob is only as strong as its numbers.  The defendant was part

16 of that mob on January 6.

17     So certainly this was a serious offense.  It was the

18 mob whose primary purpose was to conduct a direct attack on

19 our democracy, at the seat of our democracy, at the time when

20 Congress was performing perhaps its most democratic function,

21 the certification of the election, a lawful election.

22     But of course, we have to look not just at the

23 seriousness of the offense as a whole, but we have to look at

24 the nature and circumstances of the defendant's individual

25 conduct in this case.  As set forth in the government's memo,

1    and other memos that have been submitted before this Court in

2    other cases, the government is primarily looking at nine

3    factors.  I'll address some of those here for Your Honor.

4         The defendant entered the Capitol building through

5    the Senate wing door at approximately 3:01 p.m,

6    approximately 40 minutes after that door had been breached by

7    a crowd of rioters.  He entered with a large mob through the

8    door and, at the same time, there were other rioters entering

9    the window that was just adjacent to that door.

10        What I submitted as Government's Exhibit One, which

11   was a video obtained from social media which, hopefully, Your

12   Honor has had a chance to review, that video shows what the

13   defendant saw, what the defendant heard, what he knew at the

14   time he entered the Capitol building.

15        In that video, you can see that there has been

16   property damage.  There were alarms going off that could be

17   heard.  And there was law enforcement in riot gear.

18   Additionally, there was -- the defendant had knowledge that

19   tear gas had been deployed.  As he notes in his sentencing

20   memo, he aided one of the other rioters who had been doused

21   with some of the tear gas.  So clearly there was a serious

22   situation going on.

23        He spent approximately 24 minutes in the Capitol

24   building.  Certainly this is longer than those who went in

25   for a few minutes, saw law enforcement, turned around and

1    came out, but it's also shorter than those who stayed in for

2    an hour or even more.  Nonetheless, it wasn't just a few

3    minutes, it was a conscious decision to enter the building

4    and remain in the building for an extended period of time.

5           Not only did he remain in the building but he made a

6    conscious decision to enter the private office space of

7    Senator Murphy, Senate Office S140.  And it's the entry into

8    this private office that distinguishes this defendant from

9    the other non-violent defendants who walked around common

10   spaces.  He took an additional step to walk into a sensitive

11   office space, a space that wouldn't even be -- would not be

12   allowed to go into, had the building been open to the public

13   at the time.

14          For that reason, we are seeking a sentence of

15   incarceration for 14 days.  Incarceration is necessary here

16   to address the seriousness of the offense, and also to

17   provide a deterrence.  As I said before, this was an attack

18   on democracy itself; and that alone warrants jail time.  That

19   each rioter, including the defendant, contributed to the

20   chaos of January 6th.  Because of the large numbers, law

21   enforcement simply wasn't able contain it.  The large numbers

22   even emboldened others to commit acts of violence or destroy

23   property.

24          And so there has to be consequences beyond just

25   sitting home on probation.  There have to be consequences

1    that will deter future attacks on the election process.

2    Probation is not going to deter others.  We don't want the

3    public to think that participation in the riot at the Capitol

4    to overthrow the certification of the election will simply

5    lead to a sentence of probation.  Perhaps that would even be

6    an invitation for this to happen all over again.

7          Now, I said at the outset, to be fair, he did not

8    commit any acts of violence, he did not destroy any property

9    and there are some other mitigating factors in the

10   defendant's favor.  He was fairly cooperative.  He

11   interviewed with the FBI.  He provided his phone.  He

12   provided his pass code to his phone when offense arrested.

13   He did admit to being at the Capitol but he did not admit to

14   being in the building at first.  He eventually admitted that,

15   once they showed him a picture of him inside the building.

16         He did take early acceptance of responsibility and

17   he has no criminal history.   He does appear to be

18   remorseful.  But he claims in his memo that he did not know

19   there was a riot elsewhere in the Capitol.  The issue I take

20   with that is that, based on the video evidence, what he saw,

21   to me it was clear there was a riot right there where he was.

22         Certainly in other parts of the Capitol, there was

23   more violence, there was more assault on law enforcement

24   officers.  But if you see what he saw there, the destruction

25   of property, people coming through windows, there was a riot

1   right where he was, perhaps not at the time that he was

2   there, but only a riot could have caused the circumstances

3   where he was.

4        The challenge for the Court, of course, is

5   addressing the preventing of unwarranted disparities in

6   sentencing.  And that is difficult because there have been

7   over 700 defendants charged, all with unique circumstances.

8   That's why the case with this defendant and other defendants

9   who have entered sensitive space the government is treating

10  that as sort of a red line that warrants a sentence of

11  incarceration.

12       You could see in my memo, I set forth other cases

13  involving sensitive spaces such as Mazzocco, Rau, Jancart,

14  Fam,  all of them by got 45 days in prison.  I'm not seeking

15  that for Mr. Edwards, I'm seeking 14 days.  And that's based

16  on the mitigating circumstances and the factors that are

17  favorable to him.

18       I have read his letter, I've read his memo.  He does

19  appear to be a devout member of his church.  He has positive

20  letters of support.  And I have reason to believe he is a

21  good person, good person, good people can do bad things.  The

22  decisions he made on January 6th do not negate -- I'm sorry,

23  his good traits, his positive traits do not negate his

24  actions on January 6.

25       Unless Your Honor has any questions, that's

1    concludes my presentation.  For those reasons, the government

2    is seeking 14 days incarceration.

3            THE COURT:  Thanks very much, Mr. Amore.  My

4    question is you asked for 14 days of incarceration to be

5    followed by a term of 24 months of probation.  But you can't

6    do that, right?  For a petty offense, that's not a legal

7    sentence, is it?

8            MR. AMORE:  Your Honor, our office has clarified

9    that our position is that it is a legal position, to do a

10   split sentence of incarceration and probation even on these

11   misdemeanor charges.  Obviously, I have not briefed that

12   before you.

13           THE COURT:  Certainly in Superior Court, you can do

14   split sentences which make a lot of sense.  But I haven't

15   seen a request for what would effectively be a split sentence

16   or any authority for giving a split sentence for a petty

17   offense.

18           MR. AMORE:  I know this has been brought before the

19   courts in other cases.  And I do not have the case before me

20   where it was since argued that it is a legal sentence.  I

21   would have to submit something after this for Your Honor to

22   put forth my position on that.

23           THE COURT:  Okay.  All right.  Thank you very much.

24           I'll hear from Mr. Harris.

25           MR. AMORE:  Thank you, Judge.

1          MR. HARRIS:  On January 6, 2020, American democracy

2     came under attack from its own citizens.  To be sure, Gary

3     Edwards was not among those who battled police, damaged

4     property and forced the Vice President and Members of

5     Congress to be evacuated from the House chamber.

6          Indeed, Mr. Edwards didn't even know that any of

7     those events had occurred until he got home.  But the fact

8     remains, while Mr. Edwards did not engage in a riot, no riot

9     would have taken place without the cumulative presence of

10    Mr. Edwards and hundreds of others who were present on

11    January 6.

12         Mr. Edwards understands this.  He feels great shame

13    and remorse for it.  At the same time, Mr. Edwards played as

14    minor a role in the January 6th attack as any defendant who

15    has appeared in this courthouse in connection with the events

16    of that day.

17         He stands apart, not just from those convicted of

18    felonies or acting with intent to disrupt Congress.  He

19    stands apart even from most defendants who pleaded guilty to

20    the same offense that he did, that is parading, demonstrating

21    or picketing in a Capitol building in violation of 40 USC

22    Section 5104(e)(2)(G).

23         Unlike the vast majority of persons convicted and

24    sentenced for that offense so far, Mr. Edwards was never

25    present for any violence or destruction of property.  He

1    never boasted to anyone about his participation in the attack

2    and never spread misinformation about January 6.

3          In light of that exceptionally minor role, his early

4    and genuine acceptance of responsibility, his sterling

5    background and character, a just sentence in this case is a

6    sentence of probation with the requirement that he pay

7    restitution of $500.

8          If committed on any other day, the offense of

9    parading, demonstrating or picketing in a Capitol building,

10   which by statute is classified as petty offense, would be so

11   trivial as to barely register among the serious felonies the

12   Court sees on a weekly basis.

13         Of course, this was anything but an ordinary day and

14   the circumstances make it anything but trivial.  As such, it

15   is useless to compare the sentences meted out in misdemeanors

16   arising from the January 6th attack, the sentencings imposed

17   in other cases and on other days.

18         It is, however, useful to compare the conduct and

19   backgrounds of the defendants who have pled guilty to section

20   5104(e)(2)G and, now that a sizeable number of those

21   defendants have been sentenced, to take a look at who has

22   gone to jail and who has not.

23         I'm not going to go through the facts of each case

24   that I referenced in the sentencing memorandum, but I would

25   note that a review of those cases supports two conclusions.

1    First, every defendant who has been sentenced to jail or home

2    confinement engaged in more troubling conduct during or after

3    the incursion than Mr. Edwards.

4            For example, Robert Bauer, who was sentenced to 45

5    days in jail, pleaded to the same offense as Mr. Edwards.

6    But Mr. Bauer took a triumphant photo while making an obscene

7    gesture and standing his foot on a government vehicle.  And

8    when he spoke with the FBI, said quote, I don't feel like

9    I've done nothing terribly wrong. End quote.

10           Donna Bissey also pleaded to the same offense as Mr.

11   Edwards.  She was sentenced to 14 days in jail, the same

12   amount of time that the government is seeking in this case.

13   She wrote a twitter about entering the Capitol on January

14   6th, quote, It was a day I'll remember forever, I'm proud

15   that I was part of it, exclamation point.  No shame.  End

16   quote.

17           The second conclusion to draw from the examination

18   of the pleas to this offense and the resulting sentences is

19   that numerous, if not all, defendants who were sentenced to

20   straight probation, that is without jail or home detention,

21   engaged in more egregious conduct than did Mr. Edwards.  One

22   notable but not unique example is Andrew Bennett, who pleaded

23   guilty to the same offense as Mr. Edwards before Your Honor.

24           THE COURT:  I remember it.  I was very surprised

25   that the government did not ask for jail time in that case,

1    Mr. Harris, you're right.

2          MR. HARRIS:  The Court will remember that before

3    coming to D.C., Mr. Bennett posted on Facebook, quote: You

4    better be ready, chaos is coming and I will be in D.C. on

5    1-6-2021, fighting for my freedom, hash-tag, fight back.  End

6    quote.

7          Mr. Bennett taunted police, and live-streamed

8    rioters tussling with officers.  Mr. Bennett entered the

9    Capitol through the Senate wing door at 2:14 P.M.  Rioters

10   had only breached that entrance two minutes earlier at 2:12.

11   In comparison, Mr. Edwards came in through that door just

12   after 3:00 and posted nothing online.  The Court sentenced

13   Mr. Bennett to 24 months of probation and ordered him to

14   perform community service.

15         The government proposes nine factors for the Court

16   to use in assessing Mr. Edwards and each defendant's conduct

17   and placing it on a spectrum for purposes of differentiating

18   among misdemeanor defendants at sentencing.  I believe that

19   is a sensible framework and encourage the Court to apply it

20   here.

21         In doing so, even the nine factors put Gary Edwards

22   on the less culpable end of the spectrum from his complete

23   abstention from violence to his full cooperation with law

24   enforcement, including providing the access code to his cell

25   phone, to his consistent and early expressions of remorse.

1  Mr Edwards is on the more innocent end of the spectrum by the

2  government's own yard stick.

3       The only factor that points the other way is factor

4  six, that is the length of defendant's time inside of the

5  building and exactly where the defendant traveled.  Now it is

6  true that Mr. Edwards very briefly entered the Senate office

7  S140 which is the Capitol building office known as the

8  hideaway of Senator Murphy of Oregon.  It is also true, as

9  one can see from a video that Senator Murphy posted on the

10 night of January 6th, that by the time the senator got there,

11 his office had been, in his words, trashed.

12       Mr. Edwards' brief presence in Senate Office S140

13 was unquestionably criminal and wrong, just as was his

14 presence inside the Capitol building in the first place.

15 However, it is important to recall first that Senate office

16 S140 appears to be just another room in the Capitol.  It is

17 off a main hallway.  It is unmarked.  So it would not have

18 been apparent to Mr. Edwards that he had entered a more

19 sensitive space than any other part of the Capitol.

20       The government argues that he made a conscious

21 decision to enter S140.  That's true in a literal sense that

22 he consciously chose to step in that office.  But he did not

23 do so knowing that that was any more sensitive than the space

24 that he had already invaded.  Second, everyone agrees that

25 Mr. Edward played no role in forcing open the office door or

1  trashing the office and was inside only for a matter of

2  seconds.

3          This case is unlike the cases that the government

4  points to where the defendant entered a sensitive space and

5  sentenced to jail.  In each of those cases, the defendant

6  penetrated deeper into the building, invaded more obviously

7  private spaces and committed aggravating acts that fall under

8  at least one of the other nine factors.

9          To address two examples the government cites in its

10 memo, Andrew Erickson put his feet up on Speaker Pelosi's

11 conference table and took a beer from her refrigerator.  Tam

12 Pham was an active duty Houston police officer who went into

13 House leader McCarthy's office suite, and then lied to the

14 FBI about entering the Capitol.  The sentences imposed in

15 those cases are no guide as to what a just sentence is in

16 this case because the defendants did not engage in similar

17 conduct.

18         Finally, at least one defendant, Felipe Marquez,

19 entered the same office as Mr. Edwards and was not sentenced

20 to incarceration, despite more egregious conduct.

21 Mr. Marquez drove to D.C. from Florida with a handgun in his

22 car, thereby, committing a felony under D.C. law.  He entered

23 the Senate wing door mere seconds after Ahmad had

24 over-powered officers and pushed his way into the building.

25 And he entered Senator Murphy's hideaway, where he stayed for

1    about 10 minutes and smoked from a vape pen.  And the judge

2    in this district imposed sentence of 18 months of probation

3    with neither home detention nor executing incarceration.

4         To conclude this portion of my sentencing

5    presentation, 18 USC Section 3552(a)(6) provides that the

6    Court should, quote, avoid unwarranted disparities among

7    defendant with similar records who have been found guilty of

8    similar conduct.  The sentence urged by the government would

9    create just such a disparity.

10        Mr. Edwards' acts on January 6th aren't the only

11   thing to consider in crafting a sentence that is fair and

12   just.  There is another side to the ledger, that is how

13   Mr. Edwards has lived the rest of his life.  I'm not going to

14   go into detail about Mr. Edwards' achievement and

15   contributions.  The Court has read about them in sentencing

16   memo and the four letters of support submitted to the Court

17   on behalf of Mr. Edwards.  I would just note that

18   Mr. Edwards' life has truly been one of distinction and

19   merit and that weighs heavily against the government's call

20   for incarceration.

21        Two final points before Mr. Edwards addresses the

22   Court, and with the Court's permission, Mrs. Edwards

23   addresses the Court.  First, Mr. Edwards could have attended

24   this hearing virtually from his home in Pennsylvania.  That

25   certainly would have been easier.  Instead, he wanted to come

1    to D.C., to come back to D.C. I should say, to stand before

2    this Court to express his remorse.  He figured if he could

3    travel to D.C. in January, he could devote the time and

4    expense to return in December and take responsibility for

5    what he did.

6          Second, while Mr. Edwards very much hopes that the

7    Court will not impose either active jail time or home

8    detention, if the Court nevertheless concludes that home

9    detention is necessary to effectuate the purposes of

10   sentencing, Mr. Edwards asks the Court to allow him to leave

11   home in order to work at the food pantry where he volunteers.

12   This is certainly never a request I've made on behalf of any

13   other client before as an exception to home detention.

14         Mr. Edwards is already on the schedule for the

15   remainder of December and January, where expects to be

16   working three days a week.  He is an integral and essential

17   part of the volunteer effort at the pantry in Pennsylvania

18   and he tells me that it would be difficult for them to find

19   someone like him who is there at 6 o'clock in the morning and

20   getting meals ready for people who need them.

21         Unless the Court has any questions, with the Court's

22   permission, Mrs. Edwards would like to address, and then

23   Mr. Edwards.

24         THE COURT:  Thank you very much, Mr. Harris.  I will

25   hear from Mrs. Edwards first.

1    Good morning.  Please state your full name.  I would

2    be happy to hear from you have to say today..

3    MRS. EDWARDS:  Lynn Edwards. Your Honor, thank you

4    for allowing me to share my thoughts this morning.  I am Lynn

5    Edwards, Gary's wife of 45 years.

6    Although our attorney, Mr. Harris, told me that I am

7    not on trial and my Facebook post will be considered hearsay,

8    I still feel the need to clarify why I posted what I did and

9    how that reflects on my husband.

10   Never in my life could I have dreamed that something

11   I posted on Facebook would be used against my husband, would

12   lead him to be arrested and that those posts would be brought

13   up in one of highest courts in the nation.  I'm not going to

14   go through my posts one by one.  But suffice it to say that

15   the prosecution is 99 percent incorrect in its assumptions

16   that my posts were formed from statements Gary shared with

17   me.  I expressed myself off the cuff without much thought and

18   did a very poor job of stating the facts correctly.  I was

19   never bragging about him.  But reporting a combination of

20   what I saw In my mind and reiterating information I had

21   watched on conservative news.

22   I only heard from Gary once from the time he was

23   inside the Capitol.  And that was a call when he was in the

24   rotunda.  Our conversation was very brief and with few

25   details.  Even later that evening, when Gary got home, and in

1    the days following, he did not want to talk about his

2    experience very much.

3           Neither of us watched T.V. regularly, but I did

4    watch that day on conservative news station, OAN, until Gary

5    called to say he was leaving the Capitol to get on the bus to

6    come home.  The news that I was watching and reading is not

7    what was shown repeatedly on main stream news programs.

8           It was not until June, when I saw a special report

9    from the New York Times that I had a full view of all the

10   events of the day.  After watching it in horror, I made Gary

11   watch it.  I asked if he had seen any of that in person on

12   the 6th.  And he replied absolutely not.  He was shocked.

13   That was the moment we both recognized how he could be viewed

14   as being part of a riot just by being.

15          But Gary's intentions were innocent.  He was part of

16   a crowd of thousands of people who together were disruptive,

17   frightening and caused a great deal of harm.  It was a

18   terrible day in the history of our country.

19          When one is married for as long as we have been, you

20   know your spouse very well.  Their character, what they stand

21   for as well as their flaws.  My husband is a man of God,

22   faithful, loving, honest, a hard worker, morally upright,

23   generous, intelligent and forgiving.

24          At no time has he been upset with me for posting

25   what I did on Facebook.  He has taken full responsibility and

1    has apologized time and time again to me and our children for

2    the stress, shame and embarrassment he created and for not

3    understanding the severity of his actions at the time.

4         Gary is filled with deep remorse.  I wish I had been

5    there because, in our relationship, I am the one who is much

6    more observant and aware of my surroundings.  I would have

7    kept him from entering, or at least asked an officer if it

8    was okay to go inside.  I have asked many friends if they

9    knew it was against the law to enter the Capitol without

10   permission.  They did not know that.  And neither did we.

11   Call us uninformed, but that's the truth.

12         Please, Your Honor, I plead for your understanding

13   and ask your mercy and forgiveness on behalf of my inept

14   communication on Facebook and Gary's curiosity, leading him

15   to enter the building.  I beg your mercy in sentencing him.

16   Thank you for your consideration.

17         THE COURT:  Thank you very much.  I appreciate your

18   coming and sharing your comments.

19         Mr. Edwards, do you wish to say anything before I

20   impose sentence?

21         THE DEFENDANT:  Yes, I do, Your Honor.

22         THE COURT:  Come right up to the lectern.

23         THE DEFENDANT:  Thank you, Your Honor, for the

24   opportunity to address you.  I am ashamed to be here this

25   morning.  I am ashamed to be for the first time in my 68

years, standing before a judge, having pleaded guilty to a

committing a crime, ashamed to be associated with an attack

on the United States Capitol, a symbol of American democracy

and greatness that means a great deal to me.

Most of all, I, myself did not view any violence.  I

did not steal anything or damage any property.  I am ashamed

that when I walked through the open door of the Capitol

building, I was seen as part of a mob that did do these

things.  I would like to share with you my actions on January

6 and how those actions have had lasting implications for me

and my family.

I came to Washington on January 6th for two reasons:

To show my support for President Trump and to join others in

praying for our country.  Towards the end of December, I

learned that several ministry leaders that I follow, Doug

Sheets, Charlie Shamp, Nathan French, were planning to go to

Washington and pray for the country.  That was something I

was very interested in being a part of.  When I learned that

other people from the area where I live had chartered a bus,

I reserved a seat.

We arrived in Washington between 9:30 and 10:00 and

I made my way to where the president was going to speak.  It

was a very cold and windy day and I had trouble hearing the

speakers or seeing the screens where his pictures were

projected.  I stood on the mall for several hours and after a

1    while got tired and decided that I would leave.  So I left

2    and started to walk down Pennsylvania Avenue I believe

3    towards the Capitol.  When I left, the president was still

4    speaking.

5            It was my intention to walk down to the Capitol,

6    have lunch and try to meet up with one of those prayer groups

7    that brought me to Washington in the first place.  I got down

8    to the Capitol between 1:30 and 1:45 to the best of my

9    recollection and I ate my lunch.  I was able to sit on the

10   low retaining wall with my back to the Capitol facing away

11   from the building.  From this position, I did not see anyone

12   engage in violence or destroying property.

13           When I finished lunch, I saw a large group of people

14   headed up the lawn towards the Capitol and I followed them.

15   I'm not sure why I did this.  I think it was mostly just out

16   of curiosity but I followed them on to the lawn.  I had never

17   planned on going into the Capitol.

18           Since that time, I read that some groups were

19   planning a violent confrontation but I was not part of those

20   groups who had such plans.

21           I reached a large retaining wall and saw several

22   people scaling the wall and people at the top, cheering them

23   on.  I did not think at 67 years of age, this was a smart

24   thing to do.  So I followed several others around to the side

25   of the building and up the steps to the side.  I walked up

1  those steps and stood around for about 30 minutes, taking a

2  few pictures of the crowd of people around me.  I did not see

3  anyone engaged in violence and I did not see anyone

4  destroying property.

5          It appeared to me that the main door of the building

6  on that side was not open as people were just standing

7  around.  While I had my back to the building taking pictures,

8  the door was somehow opened.  I do not know how that happened

9  or who did it.  But people were slowly walking in and out of

10 door.

11         There was a man standing at the doorway, motioning

12 for people to come into the building.  Again, curiosity got

13 the best of me and I walked inside.  Cautiously entering the

14 building, I looked to see if it was okay to come in.  I saw

15 at least eight uniformed officers standing off to the side of

16 the room.  They seemed to just be standing around.  None of

17 them made any attempt to stop me or tell me not to come in.

18         After entering the building, I wandered down the

19 hallways, and then turned around and walked back.  I saw

20 someone who was doubled over and rubbing his eyes as though

21 he was in pain and I gave him a bottle of water.  I then

22 turned around and walked further down the hall where I saw an

23 opened door and walked into the room.

24         I had no idea it was a senator's office since the

25 door was open.  There were already a bunch of people inside.

1   And there were no signs or markings that this was a

2   restricted area.

3         I walked in, took a picture or two and walked out

4   down the hall a little further into the rotunda.  I spend a

5   few minutes in the rotunda and talked to a police officer for

6   a while, while I was there.  Shortly thereafter, on the other

7   side of the room, another police officer began asking people

8   to leave.  I immediately started to make my way out of the

9   building.

10        After leaving the building, I walked back to the bus

11  station.  The driver wanted us back on the bus at 4:30.  I

12  needed to find a men's room which I did at the bus station

13  and I was back to the bus around 4:00.  The bus started for

14  home a little late, left around 5:00.  We got back to

15  Pennsylvania later that evening and I went home.

16        I had no business going into the Capitol building or

17  the senator's office.  I understand now that what I did was a

18  crime.  As the son of a New York City police officer, I would

19  not have entered the building if I had been told not to by

20  law enforcement officers.

21        One of my greatest regrets in all of this is that I

22  might have added to the stress and fear that law enforcement

23  officers experienced that day.  I had no idea on January 6th

24  that elsewhere in the building that people were fighting with

25  police officers, smashing windows and storming the chambers

1   where Congress meets.

2         Like most people, I watched with horror the videos

3   of people inside the Capitol building, equipped for combat

4   and violently attacking police officers.  I believe that

5   those people who engaged in that violence and destruction of

6   property should be prosecuted to the full extent of the law.

7   I never would have set foot inside if I had known that other

8   people were there to disrupt Congress or threaten law

9   enforcement officers or congressmen.

10         There have been several consequences for me and my

11   family as a result of my going into the Capitol where I

12   shouldn't have.  My behavior that day reflects very badly on

13   who I am as a person of faith.  I believe in my life that I

14   have acted in such a way that I can say that I am a peaceful

15   and law abiding person.  It pains me, as a result of my

16   actions and the actions of those around me that day, that I

17   am viewed in another way.

18         I also worry that my actions have besmirched my

19   family's good name.  Since my arrest was on the news, my

20   wife, my adult children and even my 91 year old mother have

21   been harassed.  This has taken the form of prank calls at all

22   hours of day and night and letters from strangers saying vile

23   things about me and my family.  This has been a source of a

24   great deal of stress and caused some health issues for my

25   wife.

1      Finally, I regret that my activity that day did

2  reflect badly on President Trump.  In summary, Your Honor, I

3  am not a violent person and had no nefarious intentions that

4  day.  At the time I entered, I did not think I was doing

5  anything illegal.  I know now that I was wrong in this

6  assumption.

7      I deeply regret playing any role whatsoever in what

8  will go down in history as a day where democracy was under

9  attack.  As the Bible says in the book of James, mercy

10  triumphs judgment.  As such, I seek your mercy, knowing it is

11  not deserved.  Thank you.

12      THE COURT:  Thank you very much.

13      Okay.  I appreciate everybody's submissions and

14  statements.  I have viewed the videos.  I think that, as

15  Mr. Harris has said, and as you recognize, Mr. Edwards, that

16  this riot, this insurrection doesn't occur without people,

17  without bodies and without numerous people.  That no

18  successful insurrection occurs with five, 10 or 20 or 50

19  people, given the police presence.  What is required is the

20  crowd of people that were there.  As you yourself point out,

21  Mr. Edwards, your being there, just as anyone else being

22  there, facilitates this riot and insurrection.

23      Again, we've said before -- I've said it before and

24  certainly my colleagues have, and Mr. Harris recognizes there

25  really is no more serious and profound action that democracy

1    takes than the certifying of a lawful and fair election.

2          To the extent that anyone attempts to interfere with

3    that, particularly with force and violence, they strike at

4    the root of our democracy, at the root of our republic.  And

5    anyone who was involved on that day contributes to that.

6          I also, I certainly don't believe that you,

7    yourself, took part in any violent act or destroyed anything.

8    And the fact that you did not post anything on social media

9    or incite anyone is significant.

10         I think just in the video that I saw, that it would

11   be hard to say that you weren't aware of certain things going

12   on.  The man you were aiding had been tear gassed and was

13   crying from the result of the injury to his eyes.  And the

14   film maker, who was another rioter, was saying things as he

15   was filming when you were present, supports that the people

16   there were not simply curious about what was going on in the

17   Capitol.

18         I do agree with Mr. Harris, that your role was one

19   of the most minor that I have seen.  But again, my general

20   policy is not to give more time than the government asks.

21   But as I said on the record, I certainly would have sentenced

22   Mr. Bennett to prison given the facts of that case, which I

23   agree are worse than your facts.  And Mr. Rau and Mr.

24   Jancart, who I did give 45 days to, they did enter an office.

25   But the bigger offense was the fact that they left their

1    hotel room once they had seen the rioting and came to join

2    it.  That was the significant reason why they got time.

3            I also believe that your appearance in Senator

4    Murphy's office was very, very limited.  The video shows that

5    you are almost sheepish there and you are just standing

6    briefly there and leaving.  So I think that you don't have

7    any role in any of the damage to that office, which again is

8    significant.

9            I also certainly factor in who you are as a person

10   and the fact that you've lived 68 years with no criminal

11   offenses is good.  But what is more impressive is all of the

12   good work and volunteer actions on behalf of those who are

13   less fortunate that you have been engaging in.  To me, that

14   is a significant mark in your favor.

15           I also do take note of the fact that, as Mr. Harris

16   says, that you have come here in person, despite viral

17   threats, to accept responsibility and to show your remorse

18   here today, you and your wife.

19           Factoring all that in, I'm not going to give you any

20   jail time, Mr. Edwards.  There is a strong argument that

21   anybody who was there that day deserves jail.  And the

22   government's recommendation here is certainly a reasonable

23   one.

24           But I believe, because looking at the factors the

25   government espouses, and I think those are pretty good list

1    of factors, that you are on one of the -- you are one of the

2    least culpable people that I have seen.  And coupled with

3    your other good works in your life, show me that a jail

4    sentence is not warranted.

5        What I am going to do though is I am going to impose

6    a fine of $2500 which I believe is appropriate.  Again, I

7    don't imply that you are a rich man.  But I think that you

8    are able to pay that.  And if it causes any pain, that's the

9    point of the fine.

10       I'm also requiring 200 hours of community service.

11   But I'm going to require that community service to be

12   performed in an organization with which you don't already

13   have any connection.  In other words, I know you do community

14   service through your food pantry but I am going to order that

15   you perform community service outside of that with another

16   organization.  I will also add one year of probation.

17       All right.  It is therefore the judgment of the

18   Court that Mr. Edwards is sentenced to one year probation on

19   Count Five and a special assessment of $10.  The supervision

20   and jurisdiction of probation will be transferred to the

21   United States District Court for the Western District of

22   Pennsylvania.

23       In addition to the general terms of probation, you

24   must complete 200 hours of community service with a new

25   community service organization.  And $2500 in fine.  In

1   addition, you have the restitution of $500 to the Architect

2   of the Capitol.

3           You have the right to appeal the sentence imposed,

4   Mr. Edwards, if you choose to appeal, you must file any

5   appeal in 14 days after the entry of judgment.  Do you

6   understand that?

7           THE DEFENDANT:  I do.

8           THE COURT:  If you are not able to afford the cost

9   of appeal, you may request permission from the Court to file

10  without cost.  Do you understand that?

11          THE DEFENDANT:  I do.

12          THE COURT:  You also have the right to challenge the

13  conviction entered and sentence imposed if new and currently

14  unavailable information becomes available to you or on a

15  claim that you have received ineffective assistance of

16  counsel in connection with your plea or sentencing.  Do you

17  understand that?

18          THE DEFENDANT:  I do.

19          THE COURT:  Are there any objections to the

20  sentenced imposed by either side not previously mentioned,

21  Mr. Amore?

22          MR. AMORE:  No, Your Honor.

23          THE COURT:  Mr. Harris.

24          MR. HARRIS:  I believe Your Honor said that

25  probation will be in the Western District of Pennsylvania.

1   Mr. Edwards lives in the Philadelphia suburb which is in the

2   Eastern District.

3          THE COURT:  I'm sorry.  Thank you for that

4   clarification.  We will make it Eastern District of

5   Pennsylvania.

6          Government move to dismiss the remaining charges at

7   this time?

8          MR. AMORE:  I do, Your Honor.

9          And with the agreement of Court, I understand it's a

10  moot point but I could address the split sentence for the

11  record if you want very briefly.

12         THE COURT:  Okay.  All right.  I will grant the

13  motion to dismiss the remaining counts.  I'll waive any

14  interest on the either the fine or restitution.

15         And I would be interested, Mr. Amore.

16         MR. AMORE:  I apologize for not giving you a clearer

17  answer earlier.  But the government did request a split

18  sentence in the United States versus Griffith, criminal

19  number 21-204.  That defendant was sentenced to 90 days of

20  home detention and a 36 months probation.

21         THE COURT:  Right.  But I think, that is actually a

22  not split sentence.  The home confinement is a condition of

23  probation.

24         MR. AMORE:  Correct, Your Honor.  But they were

25  asking for a split jail sentence.  And they relied on United

1    States versus Posley, a 2009 Fourth Circuit case, where they

2    said, under 18 USC 3561, that provision that prohibits a

3    split sentence does not apply to petty misdemeanor offenses,

4    which is what is involved in this case.  I understand the

5    Court may disagree with that but that--

6              THE COURT:  Can you give me a cite for that?

7              MR. AMORE:  I can, Your Honor.  Can I step to my

8    phone for a second.

9              That's United States versus Posley, P-o-s-l-e-y, 351

10   F. Appendix 801 at 809 Fourth Circuit 2009.

11             THE COURT:  Thank you, I'll take a look at that.

12             Thank you everyone.  Have a nice holiday.  Court is

13   adjourned.

14             (Whereupon, at 11:49 a.m., the hearing adjourned.)

15

16                            ooOoo

17

18                    CERTIFICATE OF REPORTER

19        I, Lisa Walker Griffith, certify that the foregoing

20   is a correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23

24   _____     1-21-2022
     Lisa Walker Griffith, RPR               Date
25